**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

FLORIDA RETAIL FEDERATION, INC.,
et al,

       Plaintiffs,

v.                                 CASE NO.  4:08cv179-RH/WCS

ATTORNEY GENERAL OF FLORIDA,

       Defendant.

_____/

## PRELIMINARY INJUNCTION

       This is a challenge to a Florida statute that requires some Florida businesses

but not others to allow customers and some workers to have guns secured in their

vehicles in the parking lot.  The plaintiffs' principal assertion is that the statute is

unconstitutional (because, without sufficient justification, the statute compels

property owners to make their property available for purposes they do not support)

and violates the federal Occupational Safety and Health Act (because it endangers

workers).  The plaintiffs also assert the statute is unconstitutional because it draws

an irrational distinction between the businesses that are and are not required to

allow guns in the parking lot.

The defendant Florida Attorney General asserts the state has constitutionally adequate grounds for compelling property owners to allow guns in vehicles in a parking lot.  The Attorney General offers no constitutionally sufficient explanation for the statute's distinction between the businesses that are and are not required to allow guns, but the Attorney General says the distinction is just an error in drafting—that the distinction disappears when the statute is properly construed to mean what the Legislature *intended* rather than what the Legislature *said*.  The intervening defendant National Rifle Association says the statute means what it says and is constitutional as so construed.

The plaintiffs have moved for a preliminary injunction.  For purposes of ruling on the motion and subject to revision when this action is fully submitted on the merits in due course, I reach these conclusions.  First, the state may compel a business to allow a gun to be secured in a vehicle in the parking lot.  Second, the statute is valid to the extent it compels a Florida business to allow a *worker*—if he or she has a permit to carry a concealed weapon—to secure a gun in a vehicle in a parking lot.  Third, the statute is unconstitutional to the extent it compels some businesses but not others—with no rational basis for the distinction—to allow a *customer* to secure a gun in a vehicle.  Fourth, the plaintiffs have met the prerequisites to entry of a preliminary injunction barring enforcement of the

unconstitutional portions of the statute.

Section I of this opinion summarizes the law on gun possession in Florida as it existed prior to July 1, 2008—that is, prior to the effective date of the statute at issue.  Section II summarizes the new statute, § 790.251, Florida Statutes.  Section III sets forth the four factors that govern issuance of a preliminary injunction.  Section IV addresses the first factor, likelihood of success on the merits.  Section V addresses the remaining factors.  Section VI is the conclusion.

## I.      Prior Law

Throughout Florida's history, individuals have had the right to possess guns.  But there have been restrictions.  Of relevance here are the restrictions applicable to the general public—that is, to individuals who do not have special authority to carry guns (for example, law enforcement officers) and who also are not prohibited from possessing guns at all (like convicted felons whose rights have not been restored).  Statements in this opinion about a person's right to possess a gun will address the rights of a member of the general public, without noting each time that there are special categories of individuals with greater or lesser rights.

The restrictions on gun possession by the general public that were in effect prior to July 1, 2008, and that remain in effect after adoption of the statute at issue, may be roughly summarized as follows.  First, there are some kinds of guns,

including, for example, machine guns, that a person may not possess at all.  *See, e.g.,* Fla. Stat. § 790.221.[1]  This opinion ordinarily uses the word "gun" to refer only to a firearm not subject to this kind of general prohibition.  Second, there are some places, for example, courthouses, where a person may not possess a gun at all.  *See* § 790.06(12).  In other public places, a person may not *openly* carry a gun, *see* § 790.053, except for specific purposes such as hunting or to take the gun to a repair shop.  *See* § 790.25(3).  A person may not carry a *concealed* gun in public unless he or she has a state-issued permit to do so.  *See* § 790.01.  But even without a concealed-carry permit, a person may keep a gun in a motor vehicle, so long as the gun is encased.  *See* § 790.25(3)(l); *Dixon v. State*, 831 So. 2d 775, 775-776 (Fla. 4th DCA 2002).  A gun is encased, for this purpose, if it is holstered, is in a gun case or zippered container, or is in a compartment that closes—for example, in a glove box or a console with a lid.  *See* § 790.001(17).

None of these provisions limited a property owner's right to ban guns from the owner's property.  To the contrary, under the law as in effect prior to July 1, 2008, private property owners in Florida had the unfettered right to ban members of the general public from bringing guns onto the property.  Private property owners also of course had the right to *allow* guns on the property, subject to the

---

[1] Unless otherwise indicated, citations in this opinion to the Florida Statutes—other than to the newly adopted § 790.251—are to the 2007 official compilation of the Florida Statutes.

same statutes that restricted gun possession elsewhere.  Thus the decision whether to ban or allow guns rested with the property owner.

## II.    The Statute at Issue

This changed when the 2008 Florida Legislature passed and the Governor signed the statute at issue, which has sometimes been called the "guns-at-work" law.  The statute is the first limitation ever adopted in Florida on the right of a private property owner to prohibit a person who is not a law enforcement officer from possessing a gun on the property.

Before addressing the statute's specific provisions, a word is in order about the terms used in the statute and in this opinion.  The statute specifically defines the terms "employee" and "employer."  *See* § 790.251(2)(c) & (d).  The statutory definitions do not comport with ordinary English usage nor with the terms' commonly applied legal definitions.  Instead, the statute defines an "employee" as a person "who possesses a valid license issued pursuant to s. 790.06"—that is, *who has a valid Florida permit to carry a concealed weapon*—and who is either an employee (as the term is ordinarily used) or an independent contractor or a volunteer.  § 790.251(2)(c).  The statute defines "employer" as a business in any form—including, for example, a sole proprietorship, partnership, or corporation—or public-sector entity "*that has employees*."  § 790.251(2)(d)

(emphasis added).  Thus a business is an "employer" as defined in the statute only

if it has one or more workers who have a valid Florida concealed-carry permit.

This may seem odd, but the Legislature of course can define the terms it uses in a

statute to mean whatever the Legislature chooses, and the definitions in this statute

could not be more clear on this point.

   To avoid confusion, this opinion avoids the terms "employee" and

"employer" to the extent possible.  Instead, the opinion uses the term "worker" to

mean a person who is an employee (as the term is ordinarily used) or independent

contractor or volunteer, *whether or not* the person has a concealed-carry permit.

The opinion uses the term "business" to refer to a business in any form, *whether or*

*not* the business has a worker with a concealed-carry permit.

   The statute treats private businesses and public agencies the same.  But the

plaintiffs and their members are private businesses, not public agencies.  For

convenience, this opinion usually refers only to businesses, without adding a

separate reference to public agencies.

   Also, the statute accords the same treatment to customers, on the one hand,

and to other invitees, on the other hand.  For convenience, this opinion usually

refers only to customers, without adding a separate reference to other invitees.

   With that background, I turn to the statute's substance.  The statute provides

that an "employer"—that is, a business with at least one worker who has a

concealed carry permit—may not:

(1) prohibit a worker with a concealed-carry permit from securing a gun in a vehicle in a parking lot;[2]

(2) prohibit a customer—whether or not he or she has a concealed-carry permit—from securing a gun in a vehicle in a parking lot;[3]

(3) ask a worker with a concealed carry permit or a customer whether he or she has a gun in a vehicle in a parking lot, take any action against such a worker or against a customer based on a statement about whether the worker or customer has a gun in a vehicle in a parking lot for lawful purposes, or search a vehicle in a parking lot for a gun;[4]

(4) condition employment on whether a person has a concealed-carry permit;[5]

(5) terminate a worker with a concealed-carry permit, or otherwise

---

[2] *See* § 790.251(4)(a).  The statute requires the gun to be "lawfully possessed"—the worker cannot be a convicted felon, for example—and "locked inside or locked to" the vehicle.  *Id*.

[3] *See* § 790.251(4)(a).  Again, the statute requires the gun to be "lawfully possessed" and "locked inside or locked to" the vehicle.  *Id*.

[4] *See* § 790.251(4)(b).  This provision does not, however, prevent a search by an on-duty law enforcement officer "based upon due process" and complying with "constitutional protections."  *Id*.

[5] *See* § 790.251(4)(c).

discriminate against such a worker, or expel a customer, for having a gun in a vehicle on the business's property, unless the gun is exhibited on the property.[6]

A business that does not have at least one worker with a concealed-carry permit is not subject to any of these provisions.

## III.     Preliminary Injunction Standards

Entry of a preliminary injunction is governed by a well-established four-factor test, under which the moving party must establish a substantial likelihood of success on the merits, that he or she will suffer irreparable injury unless the injunction issues, that the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party, and that the injunction would not be adverse to the public interest.  *See, e.g., McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983).

## IV.     Likelihood of Success on the Merits

The plaintiffs challenge the guns-at-work statute under both the United

---

[6] *See* § 790.251(4)(e).  This provision does not explicitly refer to the parking lot, but this is what the statute means, as all parties seem to agree.  Even if a worker or customer exhibits a gun on the property, the statute forbids terminating or discriminating against the worker or expelling the customer if the exhibition was for lawful defensive purposes.

States Constitution and the Occupational Safety and Health Act (the "OSH Act").

Subsection A of this section of this opinion summarizes the governing

constitutional standards.  Subsections B through F apply those standards to each of

the statute's substantive provisions as written.  Subsection G addresses the

Attorney General's proposal that the statute be construed to mean something other

than what it plainly says.  Subsection H addresses the OSH Act.

### A.    *Constitutional Standards*

The Constitution imposes three relevant restrictions on a state's authority to

regulate a business or to regulate a property owner's use of the property.

First, under the substantive component of the Due Process Clause, a state

must not impose wholly irrational restrictions.  But at least when, as here, the

statute does not implicate the limited class of rights that have been labeled

"fundamental," a court reviewing legislative action on substantive due process

grounds properly accords substantial deference to legislative judgments.  The

question is not what the court thinks wise, but whether a legislature could

reasonably believe the measure at issue is rationally related to a legitimate end.

*See, e.g., Schwarz v. Kogan*, 132 F.3d 1387, 1390 (11th Cir. 1998) ("Substantive

due process challenges that do not implicate fundamental rights are reviewed under

the highly deferential 'rational basis' standard.")

Second, whether viewed under the Equal Protection Clause or as a component of due process, a state must not treat like-situated individuals or businesses differently without an adequate basis. When a statute impacts fundamental rights like voting or involves suspect classifications like race, judicial review is properly exacting. *See, e.g., Williams v. Pryor*, 240 F.3d 944, 947-48 (11th Cir. 2001) ("Statutes that infringe fundamental rights, or that make distinctions based upon suspect classifications such as race or national origin, are subject to strict scrutiny, which requires that the statute be narrowly tailored to achieve a compelling government interest.") But there is no fundamental right—as that term is used in equal protection jurisprudence—to keep guns out of vehicles in a parking lot. And the classifications at issue are between individuals who do or do not have concealed-carry permits and between businesses that do or do not have workers with concealed-carry permits; these are not suspect classifications. The standard of review of legislative classifications that do not impact fundamental rights or involve suspect classification is quite deferential; a legislature need only have a rational basis, broadly defined, to support the lines it draws. *See, e.g., Georgia Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319, 1321 (11th Cir. 2003) ("'In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of

facts that could provide a rational basis for classification.'") (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993)).  Still, in the case at bar there are important interests on both sides of the equation.  An individual has a substantial interest in lawfully possessing a gun. A business or property owner has a substantial interest in what occurs on the premises and in controlling the accessibility of guns there.  That a court properly reviews legislative classifications in this area only under the deferential rational basis standard does not mean there should be no review at all.  *Cf.* Gerald Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1 (1972).

Third, under the Takings Clause, a state must not take private property other than for a public purpose, and must not take private property even for a public purpose without paying just compensation.  Taking property, for this purpose, may mean any of at least three things.  First, and most obviously, property may be taken when the state directly appropriates or physically invades the property.  *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005) (citing *United States v. Pewee Coal Co.*, 341 U.S. 114, 71 S. Ct. 670, 95 L. Ed. 809 (1951)).  Second, property may be taken when the owner is required to make the property available for use by others in a manner the owner does not wish to allow.  *See, e.g., Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L.

Ed. 2d 304 (1994); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987) .  Third, property may be taken when the state regulates the use of the property so substantially that the owner is deprived of its legitimately expected beneficial use.  *See Lingle*, 544 U.S. at 538-39 (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922)).  An owner cannot legitimately expect to avoid regulation merely "adjusting the benefits and burdens of economic life to promote the common good."  *Lingle*, 544 U.S. at 539 (quoting *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978)).

Many more pages could be written on the best formulation of these standards and their nuances as applied in the case at bar.  But no purpose would be served by doing so.  On any proper view, the governing constitutional standards are highly deferential to the legislative judgment.  But on any proper view, there *are* constitutional limits.  However the standards are articulated, on any proper view the outcome in the case at bar would be the same.

**B.**    *A Worker's Gun in a Parking Lot*

The statute first prohibits a business from banning a worker with a concealed-carry permit from securing a gun in a motor vehicle in a parking lot. The provision applies only to a business that has at least one worker with a

concealed-carry permit, but this limitation makes no effective difference, because if a business has no worker with a concealed-carry permit, this provision prohibits nothing.  Thus, in effect, all businesses are treated alike.  Every business must allow any worker with a concealed-carry permit to have a gun in the worker's vehicle.  Every business may choose for itself whether to allow any other worker to have a gun in the worker's vehicle.

The Legislature's decision to protect only a worker with a concealed-carry permit easily passes constitutional muster.  This is so for the same reasons the Legislature could (and did) validly choose long ago to provide that only a person with such a permit may carry a concealed weapon *outside* a vehicle.  The permit process provides some check on the person's qualification to have a weapon in particular circumstances.

The statute thus does not draw irrational distinctions.

Nor does the statute effect a taking.  The plaintiffs and their members—to the extent they are covered by the statute at all—may continue to operate their businesses or not at their own election, exactly as they could before the statute was adopted.  They may continue to decide for themselves whether to provide parking for workers or customers.  The statute does not affect the number, identity, or location of people or vehicles on the property, or the frequency of their coming and going.  The only change the statute makes is that, if a business chooses to provide

parking, the business may not keep guns from being secured in a vehicle. This is
not a taking.

*Nollan* and *Dolan*, on which the plaintiffs rely heavily, are not to the
contrary. In *Nollan*, a state agency sought to require a beachfront homeowner, as a
condition for receiving a benefit to which the homeowner was otherwise entitled,
to provide an easement for public use of a portion of the property for beach access.
The result would have been public use of property from which the public otherwise
would have been excluded entirely. In *Dolan* a city sought to require an owner of
business property, as a condition for receiving a benefit to which the owner was
otherwise entitled, to deed a portion of her property to the city for a greenway and
for a pedestrian and bicycle pathway. The result, unlike in the case at bar, would
have been public use of portions of the property that otherwise would not have
been open to the public at all, use of the property by at least some individuals who
otherwise would not have entered the property at all, and use of the property by at
least some individuals for reasons unrelated to the property owner's business. The
guns-at-work statute, in contrast to the government action at issue in *Nollen* and
*Dolan*, seeks to make no change in the number of people using an owner's
property, the portions of the property they may use, or their purposes or activities
while there; the statute addresses, instead, only the storage of guns by individuals
who would be on the property anyway. This is not a taking, and nothing in *Nollen*

or *Dolan* suggests it is.

The issue, then, is simply whether the substantive component of the Due Process Clause prohibits a state from requiring a business to allow guns in its parking lot in these circumstances.

An important part of the analysis of this issue is the factual question of the statute's likely real-world effect. The parties have joined issue on this, submitting competing expert affidavits and taking unyielding positions. The plaintiffs suggest that a gun in the parking lot will invariably increase the risk of an unlawful or accidental shooting with no offsetting benefit, because, they say, the gun will be available to an irate worker who may use it improperly but will never be available to an honest worker in time to be used defensively to successfully avert a crime. The defendants, in contrast, say a gun in the parking lot will have great benefit in averting crime and will never lead to the gun's improper use.

Common sense and human experience suggest the truth lies between these extremes. The statute will rarely make any difference at all but may sometimes cause a result that is positive, sometimes negative. The steps in the analysis that lead to this conclusion are as follows.

First, a gun stored in a vehicle in a parking lot while the gun owner is at work will *almost* always stay in the vehicle and affect nobody's safety one way or the other. The possibility that a gun may be in a vehicle will have little deterrent

effect on others.

Second, some workers keep guns in their vehicles, and some do not.  Some who keep guns in their vehicles—but surely not all—would comply with a directive from the business for which they work not to continue the practice.  Of those who would abide a directive, many, perhaps most, do not have and will not obtain concealed-carry permits; the statute does not affect a business's right to ban their keeping of guns in their vehicles.  The statute's only effect, therefore, will be on workers who have or who obtain concealed-carry permits, keep guns in their vehicles, and would abide a directive not to do so.  The statute will affect the number of guns in the parking lot only at the margin.

Third, sometimes—though rarely—a worker with a gun in the vehicle will use it for lawful purposes to avert a crime.  The plaintiffs say there will never be time to do this, but that is wrong for two reasons.  Occasions for the lawful defensive use of a gun do not always arise in a split second; they sometimes develop over enough time to allow the retrieval of a gun from a parking lot, especially if the parking lot is close to the individual's work station, as it sometimes is.  More importantly, a worker who keeps a gun in the vehicle while at work will have it while en route to and from his or her job, but a worker who parks in the company parking lot and complies with a rule prohibiting the keeping of a gun there will not.  The worker with the gun may use it coming or going from work

(or in his or her related travels) for lawful defensive purposes.

Fourth, a gun in the parking lot sometimes—though rarely—will be used by an irate worker to commit a crime that would not occur if the gun were not readily available.  A worker who would do this would probably be among those least likely to abide a directive not to bring a gun on the property, but it may sometimes happen that a worker who would have abided a directive will nonetheless go ballistic.  Also, a gun in the parking lot sometimes—though rarely—may be stolen and used to commit a crime that would not occur if the gun were not there.

These common sense conclusions might lead a reasonable legislator to conclude that allowing workers with concealed-carry permits to keep guns in business parking lots would have either a small net positive or small net negative effect on overall public safety.  So a state legislature might reasonably choose to give such a worker a right to keep a gun in a vehicle in the parking lot.  Or a legislature might reasonably choose to prohibit guns in the parking lot.  Or a legislature might reasonably choose to leave it to the property owner to decide whether to allow or ban guns in the parking lot—precisely the approach the Florida Legislature took prior to July 1, 2008.

As of that date, the Legislature changed tack and adopted the statute allowing a worker with a concealed-carry permit to keep a gun in the vehicle while at work, with or without the permission of the business for which he or she works.

This was within the Legislature's constitutional authority.

### C.   *A Customer's Gun in a Parking Lot*

The statute requires a business with at least one *worker* who has a concealed-carry permit to allow a *customer* to have a gun in a vehicle in a parking lot.  It does not matter whether the *customer* has a concealed-carry permit.

The statute does not, however, require a business to allow a customer to have a gun in the parking lot if the business does *not* have at least one worker with a concealed-carry permit.

The result is that two businesses may be located side-by-side and be exactly the same in every respect except that one happens to have a worker with a concealed-carry permit and the other does not.  The former must allow customers to bring guns onto the property in their vehicles, but the latter need not.  This is so regardless of whether the worker with the concealed-carry permit brings a gun onto the property.

This difference in treatment of otherwise-identical businesses is not insignificant.  First, to the extent it really makes a difference in public safety whether a business allows or bans guns in the parking lot, the statute renders one business more or less safe than the business next door.  Second, the record indicates (and common experience suggests) that some customers and potential

customers are not indifferent to the presence of guns at a business.  The plaintiffs

have submitted testimony and survey results purportedly indicating that the effect

on customer behavior is likely to be substantial.  While the evidence does not

credibly establish an effect of the magnitude the plaintiffs claim, it is likely that

some customers will prefer a business where guns are banned over a business

where guns are allowed.  There is no rational basis for the state to compel one

business to allow customers to have guns in the parking lot while allowing the

otherwise-identical business next door to ban them.

The practical difficulties in applying the statute underscore this conclusion.

Workers are hired, fired, or resign daily.  Concealed-carry permits are issued,

revoked, surrendered, or expire daily.  Whether a given business has a worker with

a concealed-carry permit thus may change daily.  Moreover, the statute applies if a

business has an "employee," defined as a person with a concealed-carry permit

who is either an employee as that term has ordinarily been used *or an independent*

*contractor* or volunteer.  A business's obligation to comply with the statute thus

could turn not only on whether it has a traditional employee with a concealed-carry

permit, but on whether a person who comes to fix the plumbing has a concealed-

carry permit.  This could change minute-by-minute.  A business often will have no

way of knowing whether it is subject to the statute or not.

The Attorney General says the statute is nonetheless rational, because a

business can ask its workers whether they have concealed-carry permits, and

because the Legislature could reasonably have concluded that if a business has a

worker with a concealed-carry permit, he or she will be allowed to have a gun in

the parking lot, so that allowing *customers* to have guns will not make much

difference.  But this suggestion fails at several levels.  First, asking workers

whether they have concealed-carry permits, and updating the information daily, is

not very practical, nor does it seem to comport with the statute's concern for the

privacy interests of workers.  Second, a worker with a concealed-carry permit may

choose not to bring a gun into the parking lot; that the worker has a right to do so

does not mean that guns will be present in the lot.  Third, the risk posed by

possession of guns by workers and customers is different; a business selects and

knows its workers but usually does not select and often does not know its

customers.  Fourth, the risk posed by gun possession by persons with or without

concealed-carry permits is different; that is the reason that only the former are

allowed to carry concealed weapons on their persons and the reason—as set forth

in subsection B above—for upholding the guns-at-work statute's different

treatment of workers with and without concealed-carry permits.  Fifth, and more

importantly, guns are not subject to the principle, "in for a penny, in for a pound";

that a business must allow one gun does not mean it rationally can be required to

allow an unlimited number, especially when the otherwise-identically-situated

business next door need not do so.

The Attorney General also invokes the accepted principle that a legislature need not address all aspects of a problem simultaneously; a legislature can choose, instead, to address the part of the problem that "seems most acute to the legislative mind." *Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S. Ct. 461, 99 L. Ed. 563 (1955). Thus, for example, a legislature can regulate opticians more rigorously than sellers of ready-to-wear glasses. *Id*. This does not mean, however, that a legislature can treat two otherwise-identically-situated opticians differently, without a rational basis. That is what the guns-at-work statute attempts to do.

In sum, without any rational basis, the statute's provision on guns in customer vehicles subjects some businesses to an obligation and competitive disadvantage that otherwise-identically-situated businesses do not face. The plaintiffs are likely to prevail on their claim that the provision is unconstitutional.

### D. *Asking About, Taking Action Based on, or Searching for Guns in the Parking Lot*

The statute next prohibits a covered business from asking a worker with a concealed-carry permit or a customer whether he or she has a gun in a vehicle in a parking lot, taking action against such a worker or customer based on any statement about whether there is a gun in a vehicle in a parking lot, or searching a

vehicle in a parking lot for a gun.

This ban on inquiries, on the use of statements, and on searches is a corollary to the provision on securing a gun in a vehicle.  The ban's constitutional fate is the same as that of the underlying provision.  Thus the ban on inquiries, on the use of statements, and on searches is constitutional to the extent applicable to inquiries directed to, statements about, or searches of workers with concealed-carry permits and unconstitutional to the extent applicable to inquiries, statements, or searches involving customers.  The analysis that leads to these conclusions is the same as that with respect to the underlying provision.

It should be noted, though, that this conclusion with respect to the ban on searches does not affect the other provisions of Florida law that already limit a business's authority to search vehicles in its parking lot.  Separate and apart from any interest in gun possession, a worker or customer has privacy interests that are implicated by a vehicle search.  The state can protect those privacy interests by banning searches, at least as a general matter.  And the state has done so.  Since long prior to enactment of § 790.251, Florida law has validly prohibited a person from entering someone else's vehicle without consent.  The prohibition applies to businesses and those acting on their behalf, just as it applies to individuals.

**E.**     ***Conditioning Employment on Whether a Person Has a Concealed-Carry Permit***

The statute next prohibits a covered business from conditioning employment on whether a worker has a concealed-carry permit.  The provision apparently reflects a judgment that allowing a business to discriminate against a worker with a concealed-carry permit would be unfair to the worker or would undesirably suppress the perfectly lawful practice of obtaining such permits.  The provision is constitutionally unobjectionable.

Legislatures have considerable discretion in regulating terms of employment.  They may require the payment of minimum wages, limit hours of work or require the payment of overtime, impose and require the withholding of taxes, impose safety standards, prohibit discrimination on various grounds, and take a host of other actions.  Prohibiting a business from conditioning employment on whether a worker has a concealed-carry permit fits easily within the broad sweep of legislative authority.

This is so even though the hiring of a person with a concealed-carry permit will subject a business to the requirements of the guns-at-work statute.  If the Legislature has authority to prohibit discrimination based on holding a concealed-carry permit—as it plainly does—then the authority does not disappear just because compliance with the law may in turn subject the business to other lawful

obligations.

Indeed, the Legislature might have adopted the prohibition on discrimination against concealed-carry-permit holders precisely *because* the statute would otherwise have given businesses an incentive to engage in this kind of discrimination.  An earlier draft of the statute would have allowed all workers—not just those with concealed-carry permits—to secure guns in their vehicles, and would have applied to all businesses, not just those with workers with concealed-carry permits.  That version of the statute included no prohibition on discrimination against workers with concealed-carry permits.  The anti-discrimination provision apparently came in at the same time as the change to make the statute applicable only to workers with concealed-carry permits and to the businesses who employ them.  Protecting such workers against discrimination was a reasonable legislative response to the possibility that the new statute otherwise would provide an incentive for a business to engage in this kind of discrimination.

The plaintiffs are not likely to prevail on a challenge to this provision.


**F.**  ***Terminating a Worker or Expelling a Customer for Possessing a Gun on the Property***

The statute next prohibits a covered business from terminating or otherwise discriminating against a worker or expelling a customer:

for exercising his or her constitutional right to keep and bear arms or
for exercising the right of self-defense as long as a firearm is never
exhibited on company property for any reason other than lawful
defensive purposes.

§ 790.251(4)(e).

The provision refers to a parking lot not at all.  It applies instead to
"company property," without limitation.  It would be possible to read the provision
to require a covered business to allow guns anywhere on its property—that is, to
allow a worker or customer to carry a concealed gun on his or her person anywhere
on the business premises, so long as the gun was concealed and the worker or
customer had a concealed-carry permit.  If so construed, this would be a provision
of staggering breadth that would present substantial constitutional issues.

The Attorney General says, though, that the provision in fact deals only with
guns secured in vehicles in the parking lot, even though the provision never
mentions a vehicle or a parking lot.  No party has taken issue with that reading.  I
conclude that the statute should be so construed, though getting there requires
some explanation.

By "exercising his or her constitutional right to keep and bear arms," the
statute plainly does not mean exercising only a right that is in fact "constitutional."
If the statute really meant only rights that are in fact "constitutional," the statute
would not apply to private businesses at all.

There are two steps in the analysis that leads to this conclusion.  First, the constitutional right to bear arms restricts the actions of only the federal or state *governments* or their political subdivisions, not private actors.  *See, e.g.*, *United States v. Jacobsen*, 466 U.S. 109, 113-14, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) (holding that the Fourth Amendment—part of the United States Constitution Bill of Rights—restrains only the government, not private actors); *Schreiner v. McKenzie Tank Lines, Inc.,* 432 So. 2d 567, 570 (Fla. 1983) (holding that the protection against deprivation of inalienable rights due to race, religion, or handicap—part of the Florida Constitution Declaration of Rights—restrains only the state and its political subdivisions, not private actors).  These cases and others like them deal not specifically with the right to bear arms but with other provisions of the Bill of Rights and Declaration of Rights, respectively.  Still, the principles underlying these case are equally applicable to the right to bear arms.  Indeed, that the Bill of Rights and Declaration of Rights restrict only government, not private, action is too well settled for argument.  To his credit, the Attorney General conceded the point at oral argument.[7]

---

[7] The NRA disagreed, asserting the right to bear arms operates against private property owners, at least so long as they are corporations.  Thus, the NRA says, the Constitution begins, "We the people," not "We the corporations," and the Second Amendment gives rights to people as against corporations.  This is a radical and totally unprecedented view of both the Bill of Rights and the ability to conduct business in corporate form.  The NRA has been unable to cite any authority for its position, and I am aware of none.

Second, the entire substantive section of the guns-at-work statute, § 790.251(4), prohibits private businesses only from "violat[ing] the constitutional rights" of workers or customers in the specific respects described in § 790.251(4)(a) through (e)—that is, in the specific respects addressed in this opinion.  But a private business's banning of guns on its own property plainly is not unconstitutional; there is no constitutional right to bear arms on private property against the owner's wishes.  Thus either the statute does not apply to private businesses at all—a result that the plaintiffs would surely accept but that the Legislature plainly did not intend—or the statute's references to the "constitutional" right to bear arms must be read to include rights that arise not under the state or federal Constitution but only from some other source.  The statute's reference to the rights it protects as "constitutional" is, in effect, a rhetorical flourish.

Still, it is a rhetorical flourish that must be given a meaning, because in subsection 4(e)—unlike in other parts of the statute—there is no other delineation of the provision's scope.  Most if not all of the rights secured by § 790.251(4) did not exist before the statute was enacted; the only source of the rights is § 790.251 itself.  I conclude that when the statute refers to the "constitutional" right to bear arms, it means the right to bear arms created by § 790.251 itself.  On this view § 790.251(4)(e) protects only the right under § 790.251 to have a gun secured in a

vehicle in the parking lot.  This is the reading suggested by the Attorney General, without objection.

As so construed, § 790.251(4)(e) simply prohibits a covered business from terminating or taking other action against a worker with a concealed carry permit, or expelling a customer, because the worker or customer has a gun secured in a vehicle in the parking lot.  The business may, however, take action against a worker or customer who exhibits a gun other than for lawful defensive purposes.

The provision as so construed is constitutional to the same extent—and only to the same extent—as the underlying provisions dealing with the keeping of a gun in a vehicle in a parking lot.  Thus § 790.251(4)(e) validly prohibits a business from terminating or otherwise discriminating against a worker with a concealed-carry permit based on the worker's securing of a gun in a vehicle in the parking lot. But the prohibition on expelling a *customer* for having gun in a vehicle in the parking lot is unconstitutional, for precisely the same reasons as the requirement to allow customers to have guns in the parking lot is unconstitutional.  There is no rational basis for allowing one business to prohibit customers from having guns in the parking lot—and allowing the business to expel customers for having guns there—but to prohibit an otherwise-identically-situated business next door from doing so, just because one business has a worker with a concealed-carry permit and the other does not.

## G.     *The Attorney General's Attempt to Rewrite the Statute*

The analysis to this point has addressed the statute as written.  The Attorney General says, though, that the statute does not say what it means.  He says the statute should be applied to all businesses, not just to businesses with at least one worker who has a concealed-carry permit.  He says a court should rewrite a statute to avoid an absurd result.

The argument is not without force.  Treating identical side-by-side businesses differently in the relevant respects just because one has a worker with a concealed-carry permit and the other does not is irrational.  That is why the treatment is unconstitutional.  It is tempting just to rewrite the statute to achieve a more rational outcome.  But three considerations require rejection of that approach.

First, the statutory definitions of "employee" and "employer"—that is, the definitions that make the statute applicable only to a business with at least one worker with a concealed-carry permit—could not be more clear.  In plain, unambiguous language, the statute defines an "employee" as a person with a valid Florida concealed-carry permit.  In plain, unambiguous language, the statute defines an "employer" as a business with "employees."  In plain, unambiguous language, the statute's substantive provisions apply only to an "employer."  When the language of a statute is this clear, a court's job ordinarily is to apply the statute

as written, not to rewrite it in the belief that the Legislature must have meant something else.

Second, it is not entirely clear that the Legislature meant anything else.  And if the Legislature *did* mean something else, it is not clear what it meant.  What *is* clear is that an earlier draft would have applied equally to workers who did and did not have concealed-carry permits.  For some reason—because someone thought a person with a concealed-carry permit is more trustworthy with a gun, or because someone mistakenly thought that a person needs a concealed-carry permit to keep a gun in his or her car, or perhaps because the change was needed to garner more votes and pass the bill—the definition of "employee" was changed to apply only to a person with a concealed-carry permit.  If the reason for the change was either of the first two possibilities, the Legislature did not go far enough, because the statute's treatment of customers was not changed.  This created the anomaly that the statute requires a worker to have a concealed-carry permit in order to have a gun in his or her car, while a customer can have a gun even without a permit.  If I am to clean up the statute to effect the perceived legislative purpose, should I deal with this anomaly, too?  If, on the other hand, the reason for the change was to garner more votes, then perhaps the statute should be construed to mean exactly what it says in plain, unmistakable language; it was that language, after all, that garnered the votes.  Any legislator reading this statute would have known that it

applied only to a business with a worker with a concealed-carry permit.  *See*

*Stenberg v. Carhart,* 530 U.S. 914, 942, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000)

("When a statute includes an explicit definition, we must follow that definition,

even if it varies from that term's ordinary meaning.").

     Third, the statute operates in an area in which it is important to have clear

rules that a business can know in advance.  If a business negligently allows guns

on its property in circumstances in which the statute does not require it to do so,

the business may be held liable in a common-law negligence action for any

reasonably foreseeable damages that result.  But the statute explicitly immunizes a

business that allows guns on the property only because required to do so by the

statute.  *See* Fla. Stat. § 790.251(5)(b).  Also, the statute authorizes any aggrieved

person or the Attorney General to bring an action for injunctive relief, damages,

and attorney's fees against a business that fails to comply with the statute, and

authorizes the Attorney General to recover civil penalties of up to $10,000 for each

violation.  *See* Fla. Stat. §§ 790.251(6) & 760.51.  The financial consequences to

the business of guessing wrong on the statute's coverage thus may be severe.  With

this much at stake, it is not too much to ask the Legislature to say what it means,

and it is not to much to ask a court to apply the statute as written.

     I construe the statute to mean what it says.  When it is so construed, the

plaintiffs are likely to prevail on their constitutional claims in part, as set forth

earlier in this opinion.

**H.**   *The Occupational Safety and Health Act*

The plaintiffs next assert that the OSH Act preempts the Florida guns-at-work statute.  The OSH Act provides than a employer (as defined under the Act, not as defined under the Florida guns-at-work statute):

> (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

> (2) shall comply with occupational safety and health standards promulgated under this chapter.

29 U.S.C. § 654(a).  An employer thus has both a "general duty" under § 654(a)(1) to provide a workplace free of recognized hazards, and a separate duty under §654(a)(2) to comply with "standards promulgated under this chapter."  The Act requires the Secretary of Labor to promulgate standards using the procedures set forth in 29 U.S.C. § 655.

Both sides have cited materials they say express the sentiments of the Occupational Safety and Health Administration ("OSHA") on this issue, but any sentiments have not led to the promulgation of standards by the Secretary under § 655.  There are simply no promulgated standards on this subject one way or the other.  Businesses thus have no duty under § 654(a)(2) to ban guns from their

workplaces.  The plaintiffs rely instead on the general duty clause, § 654(a)(1).

And the plaintiffs say the guns-at-work statute is preempted because it stands as an

obstacle to accomplishing the congressional purpose of safe and healthy

workplaces.  One district court has invalidated a narrower guns-at-work statute on

similar grounds.  *See ConocoPhillips Co. v. Henry*, 520 F. Supp. 2d 1282 (N.D.

Okla. 2007).

For two separate and independent reasons, each of which would be sufficient

standing alone, the OSH Act does not preempt the guns-at-work statute.

First, on issues not addressed in standards promulgated under § 655,

Congress has explicitly authorized the states to act on worker safety issues as they

deem appropriate.  Thus in a section entitled, "Assertion of State standards in

absence of applicable Federal standards," the OSH Act provides:

> Nothing in this chapter shall prevent any State agency or court
> from asserting jurisdiction under State law over any occupational
> safety or health issue with respect to which no standard is in effect
> under section 655 of this title.

29 U.S.C. § 667(a).  Because no standard is in effect under § 655 on guns in

parking lots, "this chapter" (that is, the OSH Act) does not prevent a state agency

(this includes the Florida Legislature and Attorney General) from "asserting

jurisdiction under State law over any occupational safety or health issue" relating

to guns in parking lots.

This is a clear statement by Congress that the OSH Act does not preempt state regulation in this area.  And preemption is an issue first and foremost of congressional intent.  When Congress elects not to preempt a state law, the law is not preempted.

The plaintiffs say, though, that the State of Florida got it wrong—that worker safety is endangered, not enhanced, by guns in a parking lot, and that the guns-at-work statute thus will be an obstacle to accomplishing the congressional goal of safe and healthy workplaces.  This contention confuses the issue of who gets to decide with the merits of the decision.  Under the OSH Act, when the Secretary of Labor does not promulgate standards, a state may decide for itself whether a particular requirement will or will not enhance worker safety.  In the portion of the guns-at-work statute that is likely to survive constitutional scrutiny, the Florida Legislature decided that safety is enhanced—not endangered—when workers with concealed-carry permits are allowed to keep guns in their vehicles.  Had Congress wished to subject this kind of state decision to preemption review, it could have done so.  But it did precisely the opposite, explicitly authorizing states to act.  The Florida Legislature's conclusion, whether right or wrong, is not preempted.

The second independent ground for rejecting the plaintiffs' OSH Act claim is this.  The OSH Act is not a general charter for courts to protect worker safety.

The Act instead sets forth explicit standards that courts must enforce.  One of those is the general duty clause.  The clause requires a business to provide a workplace "free from recognized hazards that are causing or are likely to cause death or serious physical harm" to workers.  The critical substantive provision of the Act is this explicit mandate.  The plaintiffs say this means a business must ban guns from vehicles in the parking lot.

The contention proves way too much.  If the failure to ban guns were indeed a violation of the general duty clause, then all businesses would have a duty to ban guns.  One doubts that even the plaintiffs really assert this is the law; they at least have not done so explicitly in this case.  This record makes clear that some businesses believe guns in parking lots are a danger and wish to ban them.  But surely some businesses do not.  By enacting the general duty clause, Congress did not weigh in on this issue.

The plaintiffs are not likely to prevail on their OSH Act preemption claim.

## V.    Irreparable Injury, Balance of Harm, Public Interest

As set forth in section IV above, the plaintiffs have shown a substantial likelihood of success on the merits only with respect to those parts of the guns-at-work statute that deal with customers, not workers.  The plaintiffs also have met the three remaining prerequisites to issuance of a preliminary injunction barring

enforcement of the unconstitutional portion of the statute.

First, enforcement of the unconstitutional portion of the statute may cause irreparable harm. The denial of a constitutional right is often irreparable harm without more. Also, if because of the statute a customer brings a gun into a business's parking lot and it is used to shoot a person improperly, the harm will be irreparable. And a business may lose customers—that is, market share—as the result either of an improper shooting at its premises or merely because the business is forced to allow guns in its parking lot while an otherwise-identically-situated competitor need not do so. Market share once lost is not easily recouped; the loss is often irreparable.

Second, this likely harm to a business from complying with the unconstitutional portion of the statute outweighs the harm that may befall the state or customers from entry of a preliminary injunction.

Third, entry of a preliminary injunction will not be adverse to the public interest. To the contrary, entry of a preliminary injunction now, rather than awaiting further proceedings, is likely to serve the public interest in two respects. It will prevent the enforcement of an unconstitutional provision, and it will maintain continuity in the governing law (except during the brief period between the statute's effective date and the issuance of the preliminary injunction).

To be sure, in this case none of these three factors—irreparable harm, the

balance of harm, and the public interest—cut strongly one way or the other.  In this case none of these factors is as important to the exercise of discretion as the likelihood of success on the merits.  The constitutional defect in the statute—its disparate treatment of identical businesses with no rational basis—is one that can be analyzed as well now as later.  In sum, the plaintiffs have met the four factors, and when they are considered together, the proper conclusion is that a preliminary injunction should be issued.

## VI.    Conclusion

The plaintiffs are entitled to a preliminary injunction based on the familiar four-factor test and the following conclusions, which are subject to revision when this action is fully submitted on the merits in due course.

The Florida Legislature acted within its constitutional authority when it afforded a worker with a concealed-carry permit a statutory right to have a gun secured in a vehicle in a parking lot.  The Legislature acted within its constitutional authority in protecting that right by prohibiting a business from asking such a worker whether he or she has a gun in a vehicle in a parking lot, taking action against such a worker based on a statement about whether the worker has a gun in a vehicle in a parking lot for lawful purposes, searching such a worker's vehicle for a gun, conditioning employment on whether a worker has a concealed-carry

permit, or terminating or otherwise discriminating against a worker with a concealed-carry permit for having a gun in a vehicle in a parking lot.

The Legislature violated the United States Constitution, however, when it imposed limitations on a business's treatment of its customers but made those limitations applicable only to a business with a worker with a concealed-carry permit, not to an otherwise-identically-situated business with no such worker. There is no rational basis for this disparate treatment of such businesses.

For these reasons,

IT IS ORDERED:

1.  The plaintiffs' motion for a preliminary injunction (document 9) is GRANTED IN PART and DENIED IN PART.

2.  The defendant Attorney General is hereby enjoined from enforcing those portions of § 790.251, Florida Statutes, that address an employer's treatment of customers or invitees.  This injunction does not affect the Attorney General's enforcement of those portions of § 790.251 that address an employer's treatment of an "employee" as defined in the statute—that is, a worker who has a valid Florida permit to carry a concealed weapon.

3.  This preliminary injunction will take effect upon the filing of an unsecured undertaking by the plaintiffs stating that they "agree to pay such costs and damages as may be incurred or suffered by any party who is found to have

been wrongfully enjoined or restrained by the preliminary injunction entered July 28, 2008, up to $10,000." If no such undertaking is filed by August 5, 2008, this preliminary injunction will be of no further force or effect.

4. The attorneys must confer by August 12, 2008, on whether the type and amount of security required by paragraph 3 should be revised. A party that asserts the type or amount of security should be revised must file a motion to that effect by August 19, 2008.

5. This preliminary injunction is binding on the Attorney General and his officers, agents, servants, employees, and attorneys, and on those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

6. The attorneys must confer by August 12, 2008, on whether the merits should be consolidated with the preliminary injunction hearing and a final judgment rendered in accordance with this opinion, and, if not, on the scheduling of further proceedings. The parties must file by August 19, 2008, an amended joint scheduling report setting forth their positions on consolidation of the merits and, unless all parties agree to consolidation, addressing the matters identified in the Initial Scheduling Order entered May 14, 2008 (document 8).

SO ORDERED on July 28, 2008.

s/Robert L. Hinkle
Chief United States District Judge